IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

JEREMY CALLAN
    Plaintiff,

V.

DUSTIN KEMPF, NICHOLAS MARICH
EVAN BETZ, JOSH ESCOLA, JUN YAN
JACKSON TOWNSHIP POLICE DEPARTMENT
    Defendants,

Case No: 5:23 CV 1158

Judge Gaughan

FILED
AUG 10 2023
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

    Plaintiff Jeremy D Callan has filed a pro se complaint pursuant to 42 U.S.C. 1983 asserting claims against Jackson Township Police Department, Dustin Kempf, Nicholas Marich, Josh Escola, Evan Betz and Jun Yan. He alleges on July 3rd, 2022, Officer Kempf, Officer Marich and Sergeant Escola violated his constitutional rights by using excessive force, unlawful arrest, false imprisonment, malicious prosecution, and a violation of the due process clause. He alleges officer Marich violated his constitutional right against malicious prosecution on July 5th, 2022. He alleges officer Yan violated his 14th amendment by making a false report on July 12th, 2022, that was later used as material evidence to approve a protection order keeping the plaintiff from his daughter. He also alleges that officer Betz and Sgt Escola violated constitutional rights on July 12th, 2022, by violating his freedom of speech, unlawful arrest, false imprisonment, malicious prosecution, and a violation of the due process clause. He seeks 1,450,000 in monetary damages from the defendants and Jackson Township police department. Plaintiff would also like to ask the courts to charge officer Marich and Kempf under 18 U.S.C 241 and 18 U.S.C. 242

### The Complaint

1. The following is a summary of allegations on July 3rd, 2022. Officers Kempf and Marich were dispatched to 9945 Strausser St. NW in Canal Fulton Ohio for a domestic dispute. Samantha Callan called 911 and requested officer assistance at this location with a simple complaint that the plaintiff had been yelling and breaking things. Mrs. Callan informed dispatch that there were no threats made or physical altercation. Mrs. Callan informed dispatch that her firearm was locked safely away, and that the plaintiff was not armed. Mrs. Callan stated dogs, daughter and her person were locked in a bathroom and plaintiff was not actually in the house, but she believed he was in the backyard. While in route Jackson police department received a call from a neighbor that alleged, she heard plaintiff yell and stated plaintiff threw a 2x4 over the back fence. Both officers arrived simultaneously at the residence in separate vehicles. The officers were

clearly informed that the plaintiff was unarmed and didn't hurt anyone. Both officers drew the service pistols and entered the neighbor's yard. Contact was made between officer Kempf and the neighbor, who was the second caller. At this time, she stated that she heard the plaintiff yelling, beating the shit out of something and throwing a 4x4 over the back fence. At this point officer Marich noticed the plaintiff exit the residence. It is Jackson police department policy," When reasonable, the officer shall, prior to the use of deadly force, make efforts to identify him/herself as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts." Officer Marich was positioned behind a truck parked in the driveway and completely hidden from view. Officer Kempf was talking to the neighbor with his back towards the suspect's residence completely out of view. Officer Marich, from behind the truck and not visible to the suspect, begins yelling at the suspect "hands up, put your fucking hands up". Officer Kempf stopped communications with the neighbor, raised his service weapon, pointed it at the plaintiff and also began instructing the plaintiff to put his hands up. After several demands to get down on the ground, officer Marich steps out to a point where he is visible to the suspect. His service weapon was pointed directly at the plaintiff and at the residence that had the plaintiff's wife and infant daughter inside. Officer Marich asked the plaintiff," what's in your hand?" The plaintiff replied it was his E-cigarette as he raised it and both his arms up into the air to assure officers that he posed no threat to them. Officer Marich continued to scream at the plaintiff to get on the pavement which was extremely hot. Neither officer attempted to deescalate the situation. Neither officer confirmed the plaintiff's identity at this point. Prior to arrival neither officer was provided with a description or image of the subject. While still being held at gunpoint the plaintiff asked the officers to come over and talk with him, the officers refused and said the plaintiff needed to be "Pat Down " before they would be willing. The plaintiff invited them to come pat him down. The officers requested the plaintiff turn around with his hands behind his head so the officers could approach. The plaintiff did as he was asked. As soon as officer Kempf approached he proceeded to put handcuffs on the plaintiff and search his pockets. Officer Marich stood by and watched officer Kempf illegally search the plaintiff's pockets and did not intervene to stop it. When the officer conducted a full search of the plaintiff's pockets while in handcuffs and being held at gunpoint this became an unlawful arrest and officer Marich can be held liable under Bunckley vs city of Detroit. The plaintiff verbally stated he didn't consent to any searches. He was told "it doesn't matter." If the plaintiff was not lawfully under arrest the search, then qualifies as an unlawful search and would constitute a 4th amendment violation. The plaintiff attempted several times to question the officers about what he was being arrested for. Officers simply stated, "We will get to that." Plaintiff has body cam footage to prove his claims of multiple 4th amendment violations including excessive force, illegal search, unlawful arrest, and unlawful imprisonment.

    2. After the plaintiff was placed in the back of the patrol car, officer Kempf reached into the front seat, turned the thermostat from AC to heat then turned the fan speed to maximum. If the officer did it intentionally and maliciously as some sort of punishment, this could fall under an 8th amendment or a 14th amendment violation under the due

process clause. Once a person is arrested the officers are responsible for the safety and security of any person in their custody. Due to excessive temperatures both inside and outside the car the plaintiff suffered heat exhaustion, he had to be treated at a hospital and missed several days of work recovering. If temperatures outside are 90 degrees in a vehicle without heat on, the inside temperature can reach up to 130 degrees within 60 minutes; it will reach 124 degrees after only 30 minutes. An environmental temperature over 130 degrees often leads to heat stroke. Plaintiff asked several times to get out of the cruiser stating it was sweltering. It is unreasonable to believe the officer drove to the house with the heat on and the windows up in the middle of summer. The plaintiff can only conclude that he manually switched the thermostat from AC to heat. On body cam officer Kempf verbally confirms at around the 45-minute mark that he did have the heat on maximum.

    3. During the investigation, after the plaintiff was placed under arrest, the officers obtained statements from the alleged victim and witness. In neither of those statements is there any mention of the plaintiff striking the house. Statement from the witness only alleges plaintiff throwing a 4x4 over a fence. The alleged victim only claimed that he "punched" through the doggy door. Upon investigation officers found no evidence of damage to the house or to the doggy door. The single piece of evidence that was shown to the police was video where the plaintiff could be heard, off camera, saying "Open the fucking door!" While talking with the alleged victim the officer asked if the fence was always broken and she responded, "Not that bad.' Officer Marich had already spoken with the witness who informed him that the plaintiff never damaged the gate that day. Considering the information that officer Marich received from both the witness and alleged victim he still testified in court on July 7th "that the plaintiff damaged the gate by violently beating on it with a 4x4. No officer could reasonably believe that the alleged victim could have been locked in a room with no windows and would have a better vantage point of the gate over a witness that was standing mere feet away. With reckless abandon, officer Marich suppressed what he thought was a credible witness statement because it didn't fit the narrative he testified to. It can clearly be heard on body cam footage from July 4th, when officers returned to take photos of any damage, the glass panel doggy door didn't have any damage, but the officers were just going to take the photo anyway. At 16 minutes into the response officers are on body cam footage admitting that they didn't have anything more than a dispute. The Supreme Court, as well as many other district courts including the 6th circuit, have ruled that false information in an affidavit, regardless of malice or reckless disregard, is a clear violation of the 4th amendment and in all cases, officers have lost their qualified immunity.

    4. At one point, in talking to the witness, officer Marich was told that the witness had reported the plaintiff several times to officers in the weeks prior for allegations that were never substantiated, and no crime was committed. On June 30th officer Vanvoorhis was dispatched to the witness's house to report the plaintiff for watering his grass and his sprinkler was getting their property wet. The officer was told when he arrived the the plaintiff's sprinkler had gotten their house and plants wet with water. The officer

stated on a body camera to the witness and her husband that no crime was being committed and it was a civil issue. This body cam footage will be entered into evidence to confirm the statement. The report was taken because the witness and her husband were getting hostile with the officers. After officer Marich was told the police refused to charge the plaintiff because no crime was being committed, he assured the witness that because the plaintiff was "non-compliant" with officer Kempf and Marich the neighbor would have a much better chance of Massillon court pursuing charges. Plaintiff was charged with the alleged offense of criminal mischief which was later dismissed by the prosecutor for lack of evidence to convict. The plaintiff believes this was obviously malicious prosecution which is a clear violation of the 4th amendment.

5. Because of the arrest of the alleged domestic violence plaintiff was served with a protection order that included him being kept from having any contact with his 19-month-old daughter. A protection order remains in place to this day, 13 months later. This lack of contact with the plaintiff's daughter is by far the worst injury inflicted. The plaintiff has no idea what it would take to repair that relationship. Officer Marich at the criminal hearing for the protection order lied under oath multiple times in his testimony. Because of his perjured statements officer Marich is in clear violation of the 14th amendment. His testimony directly interfered with the plaintiff's constitutional right to raise a family as ruled on by the Supreme Court in Pierce v. Society of Sisters and Stanley v. Illinois.

6. On July 11th officer Betz was dispatched to 9969 Strausser St., to the plaintiff's neighbor's residence, for an alleged protection order violation. The plaintiff was arrested on July 12th for a violation of a protection order. The violation alleged harassment of the plaintiff's wife because of a Facebook post. The post in question was not even about the plaintiff's wife and was aimed at criticizing the Jackson Township police department. The post made no mention of the plaintiff's wife by name, was not posted on her personal page nor was she tagged in the post. The plaintiff's wife did not have an active Facebook account at the time. There is no basis for alleging the plaintiff's wife was harassed by simply mentioning the words "my wife" in a public post. In no way could it be construed as harassment even in the furthest stretch of one's imagination. The protection order specifically states the defendant shall not initiate or have any contact with the protected person and cannot ask a third party to contact the protected person. Referencing Bey V. Rasawehr is a clearly established first amendment violation to restrict content-based speech. Content based speech is exactly what the post was referring to. The post was no different than the plaintiff talking about his situation in public, someone overhearing the plaintiff mention "my wife" and going back and telling her the plaintiff said "my wife" in public. The officer that drafted the affidavit recklessly disregarded the truth by stating the plaintiff harassed his wife by posting on Facebook. An email from the prosecutor, which will be submitted directly states the protection order does not limit the plaintiff from simply talking about the situation. The officer stated, on body cam footage, the plaintiff simply posted public records which does not constitute a crime; however, the officer still chose to draft an affidavit for an arrest warrant which demonstrates his reckless

disregard of the truth.
Because of this arrest the plaintiff spent several days in jail, he had to post a 2,500-dollar bond and absorbed more legal fees. These two arrests caused extreme financial hardship for the plaintiff by way of loss of business, the added expense of having to make other living arrangements and increased legal fees. The plaintiff's reputation in the community and potential to gain more business has suffered greatly. These officers, according to "Sykes v Anderson, Valkilian v Shaw and McCallum v. Geelhood" are not entitled to qualified immunity due to them providing false information in the reports and affidavits. The plaintiff further suffered emotional distress which caused him to miss multiple workdays and to seek counseling.

7. On July 12th, 2022, officer Yan, while responding to a complaint regarding the alleged violation of a protection order, reported to a witness that the plaintiff had threatened physical harm and threatened to shoot officers in the course of their duties. Such a threat if it had happened would be a violation of O.R.C 2921.03 and a felony of the 3rd degree. Officer Yan was not aware of any pending criminal charge of the plaintiff threatening a peace officer. There was never a report filed that alleged the plaintiff threatened a peace officer. Officer Yan had the resources to verify if the reported statement he made had any factual basis and made no effort to do so. Plaintiff filed a complaint against officer Yan, during the internal investigation Officer Yan admitted to making that false report and was counseled. Because of the false report officer Yan made, the alleged victim was able to use that information to obtain a 3-year protection order and the guardian ad litem for plaintiffs' daughter also received a copy of this report by officer Yan. Officer Yan's actions are a clear violation of the 14th amendment. Furthermore, Officer Yan should not be entitled to qualified immunity because of his false report.

8. There is evidence that seven patrol officers, directly dealing with the plaintiffs' situation, violated policy and interpreted the law incorrectly. Seven of 35 patrol officers constituted 20% of the department, however 100% of the officers who directly responded to the plaintiff's situations violated policy and law. This shows that Jackson Township police officers are inadequately trained in domestic response and laws. Plaintiff attempted to find further incidents demonstrating lack of training in this area, but domestic violence laws are very restrictive when it comes to public information. The plaintiff feels that he has a good amount of evidence to show lack of training and lack of supervision is a problem in the department. The plaintiff feels the need to hold the department responsible for the violations against him. The policy at Jackson Township also states a supervisor tasked with reviewing reports of domestic violence should consider referring to federal authorities if they believe federal laws are in question. The plaintiff believes this indicates all domestic reports require supervisors to review the report and evidence. Not fully doing so would show lack of supervision. ORC 2935.032 is the law that required Jackson township to draft a policy for domestic violence. This law, by stating peace officers are required to make an arrest, not needing probable cause or a warrant to do so and just based on a statement that the officer can reasonably believe to be true is enough to arrest a citizen, is unconstitutional. The way it

is written by Ohio policy makers goes against the 4th amendment of the constitution and would put any department liable for a Monell claim in situations such as. By law it is the department's responsibility to ensure that their training, interpretation, and implementation of actions follow that law. However, this is the only known law in the ORC that requires all departments to implement a policy to make sure officers are trained to interpret the law properly and the plaintiff believes this shows the obvious known risk of violating a citizen's constitutional rights. Some of the most heinous crimes such as murder or sexual assault require factual evidence and or probable cause to obtain a warrant for arrest. This law and policy require no evidence, no warrant, and simply a statement by an alleged victim to arrest a person for domestic violence. This law along with inadequate training constitutes a 4th amendment violation. It should be obvious to any officer that clear and concise information be presented to avoid violating citizens' rights. Domestic violence can have a serious effect on any victim and should not be taken lightly, however, wrongly interpreting the laws falsely charging someone with domestic violence has devastating effects on many areas of that person's life and this case is a perfect example of those unnecessary consequences. The fact that the law states arrest is preferred and a policy in place at all police departments should demonstrate the need for additional specialized training.

9. The plaintiff would like the court to consider holding Officers Kempf, Marich, Betz and Sgt Escola liable for 150,000 each for damages and injuries. Their violations of the plaintiff's rights, when clearly established case law exists, and that any reasonable officer should have been aware of, demonstrates a blatant disregard for the plaintiff's constitutional rights. Plaintiff would also like to include punitive damages to each of the officers in the amount of 100,000 dollars each. The plaintiff would like to hold officer Yan responsible for 50,000 for damages and injuries, also 100,000 in punitive damages, for the false report he made that was used as material information in the approval of the protection order that was granted against the plaintiff. The plaintiff would like to hold the township responsible for the sum of 300,000 for the same reason put forth. By far the worst and most painful injury is having the plaintiff's only child taken away due to the false police reporting and wonton behavior by these officers. The plaintiff hopes for the chance to present evidence to back up his claims to the court; the plaintiff further hopes these officers are held accountable for their actions. This is the worst type of behavior any officer can demonstrate, and they should never be allowed to treat a citizen like this again.

Respectfully submitted,

/Jeremy Callan  
12113 Wayland Avenue  
Cleveland OH 44111